RIESTERER et al. v. HORTON LAND & LUMBER COMPANY et al., Appellants.

Division One, February 12, 1901.

1. **Corporation: ISSUE OF BONDS: SIXTY DAYS' NOTICE IN NEWSPAPER: WAIVER.** In order to the validity of bonds of a corporation it is not necessary that sixty days' notice by publication be given of a meeting of the stockholders to vote upon their issue. Where all the stockholders signed a written resolution or agreement that the bonded indebtedness be increased to an amount equal to the company's entire actual indebtedness then existing, to be sold at par, and the proceeds used to pay off such indebtedness, and expressly waiving the sixty days' notice and all other notice of a meeting for the purpose of taking an election for or against an increase of its bonded indebtedness, said bonds are valid obligations of the company. Said statutory requirement is for the benefit of the stockholders, and its protection may be waived by them, and if waived, neither the company nor its creditors can be heard to deny the validity of the bonds issued at such meeting. (Overruling State ex rel. v. McGrath, 86 Mo. 241.)

2. ———: ———: **CERTIFICATE OF TRUSTEE: PLEADINGS: PRIORITIES.** The bonds of a corporation contained a provision that they were not to "become obligatory until the certificate thereon shall be signed by the trustee" and the certificate he was to sign was: "This bond is one of a series and issue amounting in the aggregate to $110,000, described in the mortgage deed of trust mentioned therein." Only a small part of the bonds were signed by the trustee until after the suit in attachment was begun against the company's' property. But their invalidity on that account was not raised by the pleadings, and no such point was raised at the trial, but the attachment creditors pleaded that the rights of the holders of all the bonds were inferior

to theirs. *Held*, that it is now too late for the attachment creditors to admit that those bonds which were properly signed by the trustee are superior in right to theirs and ask for an adjustment of the priorities of themselves and the holders of all the bonds.

3. ———: BONDS: NOTES OF ANOTHER COMPANY: COLLATERAL: NATIONAL BANK LAWS. Where a national bank, in an effort to make it appear that it holds the notes of two corporations instead of bonds secured by real estate, and thus to avoid the national bank laws, takes the bonds of a land company and an equal amount of its notes, and then as apparent collateral security requires the land company to get and indorse for it the notes of another company of equal amount, such bonds are not collateral security for the payment of the notes of such other company, for such other company owed neither the bank nor the land company anything, and its notes were uncollectible, and the land company can not usurp the province of the Government and punish the bank for the evasion of the national bank laws.

Appeal from Ripley Circuit Court.—*Hon. Jno. G. Wear,* Judge.

AFFIRMED.

*Seneca N. Taylor, Chas. Erd* and *S. C. Taylor* for appellants.

(1) The Constitution is imperative to the effect that the stock and bonded indebtedness of a corporation shall not be increased without first giving sixty days' public notice, as provided by law. Constitution, art. 12, sec. 8; R. S. 1889, secs. 962, 2499. And the Revised Statutes declare in positive terms, that such notice shall be published in some newspaper sixty days previous to the date such meeting is to be held, the last insertion to be not less than one, nor more than six days before the meeting. R. S. 1889, secs. 963 and 2500. This court has expressly held that this sixty days' notice was in-

tended for the public at large, and is essential as a condition precedent to the things for which the statute requires the sixty days' notice before the stockholders' meeting, and it would seem that the statute could have no other rational interpretation. State ex rel. v. McGrath, 86 Mo. 241. The Constitution and statutes being in force at the time the bonds in question were issued, constitute prohibitions against the corporation issuing bonds without an action authorizing it at a stockholders' meeting held after the sixty days' public notice required by the law. Ampleman v. Ins. Co., 35 Mo. App. 314; State ex rel. v. McGrath, 86 Mo. 241; Havens v. Ins. Co., 123 Mo. 418; Daggs v. Ins. Co., 136 Mo. 390; Cleveland City, etc., Co. v. Taylor Bros. I. Co., 54 Fed. Rep. 182; Head v. Ins. Co., 6 U. S. (2 Cranch), 127. (2) If a corporation does not act within the authorized objects of its charter, or performs an authorized act by a prohibited method, the act will be wholly void. St. Louis v. Russell, 9 Mo. 507; Blair v. Ins. Co., 10 Mo. 559; Christian University v. Jordan, 29 Mo. 68; Railroad v. Winkler, 33 Mo. 354; Bank v. Young, 37 Mo. 398; Ruggles v. Collier, 43 Mo. 353; St. Louis v. Clemens, 43 Mo. 404; Bank v. Harrison, 57 Mo. 511; Matthew v. Skinker, 62 Mo. 311; State ex rel. v. McGrath, 86 Mo. 241; State ex inf. v. Lincoln Trust Co., 144 Mo. 586. (3) Corporations must act strictly within the scope of the power conferred on them by the act calling them into being; and when a grant of power from the Legislature is relied on, the mode and place prescribed in the grant for doing the particular thing must be pursued according to the law creating them, else the act is void. Bank v. Bank (Mo.), 53 S. W. 989; Matthew v. Skinker, 62 Mo. 331; Railroad v. Marine Co., 36 Mo. 294; Bank v. Young, 37 Mo. 398; Duke v. Markham, 105 N. C. 131; Pierce v. Building Co., 9 La. 397; Lincoln v. Express Co., 45 La. Ann. 729; Shepp v. Railroad, 13 Pa. Co. Ct. Rep. 254, 2 Pa. Dis. Rep. 679; Bank v. Danbridge, 12 Wheat. 64; Head v. Ins.

Riesterer v. Land & Lumber Co.

Co., 2 Cranch 127; Railroad v. Railroad, 75 Ky. 6.     (4) The law is well settled that where a statute is founded upon public policy, a party can not waive its provisions, even by express terms. The contracts of private persons can not alter a statutory rule established on grounds of public policy.     State ex rel. v. McGrath, 86 Mo. 241; White v. Ins. Co., 5 Central Law Journal, 486; Merrill v. Town of Monticello, 138 U. S. 673; Duke v. Markham, 105 N. C. 131; Pierce v. New Orleans Building Co., 9 La. 397; Lincoln v. Express Co., 45 La. Ann. 729; Shepp v. Railroad, 2 Pa. Dis. Rep. 679.     (5) If this court should hold that some of the bonds are not invalid, though issued in violation of the Constitution and statutes, and that such bonds might have been lawfully pledged as collateral security to the German-American Bank, when properly certified, still, we insist that, as to sixty of the bonds for $500 each, found in the possession of the German-American Bank, which were not certified by the trustee until more than four months after appellants' lien by attachment had obtained, that the attachment lien and title acquired thereunder are prior and superior to that part of the decree in favor of the German-American Bank predicated upon the bonds not so certified. Burk v. Dulaney, 153 U. S. 228; Hurt v. Ford, 142 Mo. 306 to 308; Ayers v. Millroy, 53 Mo. 516; Jones on Corporate Bonds and Mortgages, secs. 206, 210; Massachusetts v. Railroad, 83 N. Y. 223; Ledwich v. McKim, 53 N. Y. 314; Speer v. Railroad, 79 Ala. 576; Zabriski v. Railroad (U. S.), 23 Howard 381.

*J. E. McKeighan, Shepard Barclay* and *M. F. Watts* for respondents.

(1) The constitutional and statutory provisions that sixty days' notice must be given of intention to increase "bonded indebtedness," do not apply to first or original indebtedness.

Trust Co. v. Railroad, 51 Fed. 840. (2) Such statutory provisions, even if applicable to the first issue of bonds, are designed solely for the protection of the stockholders, and may be waived by them. 5 Thompson on Corporations, secs. 6060, 6069; Morawetz on Corporations, sec. 675; 2 Cook on Corporations, sec. 599; Campbell v. Mining Co., 51 Fed. Rep. 1; Beecher v. Market & Mill Co., 45 Mich. 103; Thomas v. Railroad, 104 Ill. 462; Seymour v. Spring Cemetery Ass'n, 144 N. Y. 333; Trust Co. v. Railroad, 67 Fed. Rep. 49; Commrs. of County of Knox v. Aspinwall, 62 U. S. 539; Bank v. Pierce, 117 Mich. 376, 75 N. W. 1058; Bridgeport Electric, etc., Co. v. Meader, 72 Fed. 115; Trust Co. v. Condon, 67 Fed. 84; Wood v. Corry Water Works Co., 44 Fed. 146; Hardware Co. v. Phalen, 128 Pa. 110; Jones v. Guaranty, etc., Co., 101 U. S. 622; National Bank v. Mathews, 98 U. S. 621; Nelson v. Hubbard, 96 Ala. 236; Zabriskie v. Railroad, 64 U. S. 381; Railroad v. Trust Co., 173 U. S. 99; Jones on Corporate Bonds and Mortgages, sec. 173. (3) The bonds in question having been issued with the consent of all the stockholders, and the land company having received and retained full consideration therefor, the company and its stockholders, and all claiming under the company, are estopped from denying the validity of the bonds. Authorities cited under point 2. (4) The provision in the bonds, to the effect that they shall not become obligatory until certified, is intended for the protection of the maker only, can be waived, and in this case was waived. Atwood v. Railroad, 85 Va. 966. (5) An attachment is a lien on the property attached only to the extent of the debtors' actual interest therein. Barnes v. Cox, 58 Neb. 175, 79 N. W. 550; Karger v. Steele-Wedeles Co., 103 Wis. 286; Potter v. McDowell, 43 Mo. 93; Stilwell v. McDonald, 39 Mo. 282; Wright v. Techener, 104 Ind. 185; Hovelman v. Railroad, 79 Mo. 682.

MARSHALL, J.—This is an action to foreclose a deed of trust, covering several thousand acres of land in Ripley county, Missouri. The plaintiffs are the trustee and the holders of all the outstanding bonds secured by the deed of trust, and the defendants are the mortgagor and its creditors and other parties claiming title under it. There was a decree for the plaintiffs, from which the defendants perfected this appeal.

Briefly stated, the controversy is this. The Horton Land & Lumber Company owned the land; there was a mortgage on it for $6,500; outside of this the company owed a large floating debt, the bulk of which was held by the seven banks that are parties hereto; the total indebtedness amounted $110,000; the company desired to fund the indebtedness, and pay the small creditors and concentrate the indebtedness in the hands of the seven banks; to accomplish this it made a deed of trust, for $110,000, securing bonds to that amount, and sought to have each of the banks take bonds covering the amount of their claims and to a further amount equal to forty-eight per cent of their respective claims, and to apply the forty-eight per cent cash thus raised to pay the smaller creditors. The banks agreed to this arrangement. After about $40,000 bonds had been negotiated it was found that the deed of trust was defectively executed; so, to remedy the defect, on the fifteenth day of May, 1895, all of the stockholders of the Horton Land & Lumber Company signed a written resolution or agreement that the bonded indebtedness be increased to $110,000, and directing the vice-president and secretary to issue bonds to that amount and secure the same by a mortgage on the real estate and franchises of the company, and providing that the bonds should not be sold for less than their par value, or for any purpose except money, labor done or money or property actually received, and expressly waiving the sixty days' notice and all other notice required by law to be given of a meeting of stockholders of

said company, "called to be held at office of said company on
the twenty-first day of May, A. D. 1895, at nine o'clock a..m.,
for the purpose of taking an election for or against an increase
of the bonded indebtedness of the said company as aforesaid,
and desire and direct that this paper be taken as our vote in
favor of said increase and in favor of the adoption of the above
resolution."

On May 17, 1895, the directors held a meeting and unan-
imously rescinded the prior defective mortgage for $110,000,
and also rescinded a resolution directing a general assignment
for the benefit of its creditors.

On May 21, 1895, the directors held a meeting and, pur-
suant to the direction in the resolution of the stockholders of
May 15, aforesaid, adopted a resolution ordering the issuance
of bonds for $110,000 secured by mortgage, and this is the
mortgage sought to be foreclosed in this case.   Accordingly
the bonds were issued and the deed of trust properly executed.
The bonds contained this provision:   "This bond will not be-
come obligatory until the certificate thereon shall be signed by
the trustee," and the certificate to be signed by the trustee was:
"This bond is one of a series and issue amounting in the aggre-
gate to $110,000 described in the mortgage deed of trust men-
tioned therein."

Thereupon the seven banks took the bonds and advanced
the forty-eight per cent, and with the cash thus secured, the
first mortgage for $6,500 and the claims of the smaller credi-
tors were paid, the defective mortgage for $110,000 cancelled,
the $40,000 bonds secured thereby which had been negotiated
were taken up, and the funding scheme carried out.

Thus the matter stood from about June, 1895, until the
first of April, 1896, when five of the seven banks that went
into the funding arrangement, began suits by attachment
against the Horton Land & Lumber Company, in the circuit
court of the United States for the eastern division of the east-

ern district of Missouri, to recover the amounts of their respective claims, and offering to return the bonds they had received, claiming that they were void because no notice of the stockholders' meeting which authorized their issue was published for sixty days before the meeting.   These cases resulted in consent decrees stipulating that the five banks should surrender the bonds they held and take judgment against the company, but that the decree should not be construed as settling or affecting the validity or invalidity of bonds held by persons other than the five banks.   The plaintiffs in this action were not parties to that agreement.   Thereafter, executions were issued on said decrees, the lands covered by the deed of trust here sought to be foreclosed  were sold by the United States marshal, and were bought by defendants Bell and Murphy, as trustees for the benefit of said five banks.

When the bonds matured they were not paid, and the trustee under the deed of trust and the bondholders instituted this action in the circuit court of Ripley county to foreclose the deed of trust, with the result first herein stated.

## I.

The defendants contend that the bonds and deed of trust are void because sixty days' public notice of the meeting of the stockholders at which their issue and execution was authorized was not given.

There is no claim made that the bonds are fictitious or were fraudulently issued.   Neither is it claimed that the company did not get value received for every dollar represented by them.   It is admitted that every stockholder of the company signed the resolution directing the issue.   The sole claim is that under the Constitution and laws of this State, sixty days' public notice must be given of any meeting held to vote upon a proposition to issue bonds, and as this was not done in this case the bonds and mortgage are void.

This contention is based upon section 8 of article 12 of the Constitution, and section 2499, Revised Statutes 1889. The provision of the Constitution is as follows:

"No corporation shall issue stock or bonds, except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void. The stock and bonded indebtedness of corporations shall not be increased, except in pursuance of general law, nor without the consent of the persons holding the larger amount in value of the stock first obtained at a meeting called for the purpose, first giving sixty days' public notice, as may be provided by law."

The statute carrying the constitutional provision into effect is:

"Any corporation may increase its capital stock or its bonded indebtedness with the consent of the persons holding the larger amount in value of the stock, which consent to such increase shall be obtained at a meeting of the shareholders, called for that purpose—sixty days' notice of the time and place of such meeting and of the amount of the proposed increase of stock or bonded indebtedness having been given as hereinafter provided; but the shares of stock or bonds arising from such increase shall only be disposed of for money paid, labor done or money or property actually received. All fictitious issue or increase of stock or bonds of any corporation shall be void."

In further support of their contention the defendants rely upon the case of State ex rel. v. McGrath, 86 Mo. 239.

That was a case by mandamus to compel the Secretary of State to issue to relator a certificate that it had complied with the law in increasing its capital stock. The Secretary of State refused to issue the certificate solely because sixty days' public notice of the meeting of the stockholders, at which the increase of stock was authorized, had not been given. It appeared that a notice was given (not sixty days public notice) and received,

Riesterer v. Land & Lumber Co.

and all of the stockholders assembled and signed a written consent to hold the meeting without further notice, and being assembled they unanimously voted to increase the capital stock. It was held that the sixty days' notice required by the Constitution was for the benefit of the public and not merely for the benefit of the stockholders. It was said that section 938, Revised Statutes 1879, then in force, in addition to a publication of a notice once a week for sixty days before the meeting, required a notice to be sent by mail to each stockholder, sixty days before the meeting, and the deduction was drawn therefrom that the notice by mail was intended for the benefit of the stockholder while the published notice was intended for the benefit of the public, and it was suggested that the reason for requiring the notice to the public was "the prevalent practice of watering the stock of corporations resulting oftentimes to the injury of the public." It was accordingly held that the stockholders could not, even by unanimous consent, waive the public notice, and therefore the increase, accomplished in the manner stated, was void.

It is a settled rule of construction that, "every word employed in the Constitution is to be expounded in its plain, obvious and common-sense meaning, unless the context furnishes some ground to control, qualify or enlarge it. Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them with the help of common sense, and can not be presumed to admit in them any recondite meaning or any extraordinary gloss." [1 Story, Constitution, sec. 451.]

There is great diversity of opinion as to whether any pro-

vision of a Constitution can be construed to be merely directory, and the rule obtains in some jurisdictions that every provision of the Constitution is mandatory.     In our State provisions of the Constitution have been held merely directory. Section 24 of article 4 provides that, "The style of the laws of this State shall be:    Be it enacted by the General Assembly of the State of Missouri, as follows:"    Yet in Cape Girardeau v. Riley, 52 Mo. 424, this was held to be merely directory. Section 38, article 6, provides that, "All writs and process shall run and all prosecutions shall be conducted in the name of the State of Missouri," etc.; yet in State v. Foster, 61 Mo. 549, this was held to be only directory.     Section 37, article 4, provides that, "No bill shall become a law until the same has been signed by the presiding officer of each of the two houses in open session," and further that before the officer affixes his signature he shall suspend all other business, order the bill read at length, and if no objections are made, sign it, and the fact shall be noted on the journal and the bill immediately sent to the other house, and if objections are made the proceedure is prescribed for determining them.     Yet in State ex rel. v. Mead, 71 Mo. 266, the first clause, literally quoted above, was held mandatory but the remainder of the section was declared to be merely directory.     The decision of such questions ought alway to be approached cautiously and every word of the Constitution given full force, and a practical meaning be attached to the provision construed.     In no case, however, ought a construction be adopted that could serve no useful purpose, or that would be absurd or make the provision ridiculous.

The Constitutions and laws of many of our sister States contain provisions similar to the provisions of our Constitution, and the statutes requiring a public notice to be given a specified number of days before the meeting of the stockholders is held to increase the capital stock or bonded indebtedness, and in every instance in which the question has come before the courts it has

been held that the notice required is for the benefit of the stock-holders, that the public has no interest in the matter, and that if all the stockholders get together, even without any previous notice, and unanimously (or the requisite majority of the whole number so assembled) vote to increase the stock or bonded indebtedness the act is legal, for those for whose benefit a protection is promised, may, if *sui juris,* waive the benefit of the protection, and bind themselves by contract.

For these reasons, mortgages executed to secure a bonded indebtedness pursuant to the order of the stockholders when they were all assembled in a meeting, although the meeting was not called by giving the public notice required by the Constitution, have been held to be valid: Campbell vs. Mining Co. (Montana), 51 Fed. Rep. 1; Bridgeport Electric & Ice Co. v. Meader (Alabama) 72 Fed. Rep. 115; Central Trust Co. v. Condon (Tennessee) 67 Fed. Rep. 84; Wood v. Corry Water Works Co. (Pa.) 44 Fed. Rep. 146; Nelson v. Hubbard, 96 Ala. 238.

In other instances the provision for notice was by statute but not in the Constitution, and the same rule was adopted: Beecher v. Milling Company, 45 Mich. 103; Thomas v. Citizens Railroad Co., 104 Ill. 462; Farmers Loan & Trust Co. v. Railroad (Ohio), 67 Fed. Rep. 49; Commissioners of County of Knox v. Aspinwall, 62 U. S. 539.

The same doctrine is maintained by the standard textwriters: 5 Thompson on Corporations, secs. 6060 and 6069; 2 Cook on Corp., 599; 2 Morawetz on Corp., sec. 675.

The rule thus adopted as to private corporations, is very different from the rule applicable to public corporations. In the latter case the public officers must act strictly and literally within the letter of the law giving the power to act, and if a specific mode or method for contracting is prescribed it must be rigidly followed or the act will be void: Ruggles v. Collier, 43 Mo. 353; St. Louis v. Russell, 9 Mo. 507; Keating v. Kansas City, 84 Mo. 415, l. c. 419.

The reason for the difference is plain; public officers are trustees for the people, who have to pay whatever liability is incurred, and are vested with only the powers conferred, to be exercised in the modes prescribed, whereas, the stockholders of a private corporation act for themselves, bind themselves and must pay whatever liability is incurred. The rest of mankind are not liable for their acts, incur no responsibility from their contracts, have no voice in their meetings, and no standing in court to call their acts in question. The State creates the corporation, can place limitations upon their power, and can call their acts into question. But the people composing the State, as individuals, have no interest in or power over them.

It has been pointed out that it was held in State ex rel. v. McGrath, supra, that the sixty days' notice was for the benefit of the public and not for the benefit of the stockholders.

A similar contention was made as to the statute of Michigan, which required a public notice of a meeting for such purpose to be given, and in Beecher v. Milling Company, 45 Mich. 103, Cooley, J., answered in his usual clear style and said: "These are strong and seem very imperative words, and if full effect is given to them it may be difficult to support this mortgage. But we are not hastily to conclude that words thus apparently imperative are to be given a literal interpretation and enforced accordingly. Courts often speak of acts and contracts as void, when they mean no more than that some party concerned has a right to avoid them. . . . . If it is apparent that an act is prohibitory and declared void on grounds of general policy, we must suppose the legislative intent to be that it shall be void to all intents; while if the manifest intent is to give protection to determinate individuals who are *sui juris,* the purpose is sufficiently accomplished if they are given the liberty of avoiding it. . . . . The statute now under consideration was passed to protect the interests of stockholders in mining companies. It intends that their mining property shall not

be conveyed away or mortgaged except by their deliberate action, after they have been notified of the proposal to do so, and have had time to deliberate upon and fully consider it. But the matter does not concern the public at large; no principle of public policy is at stake; no wrong, direct or indirect, is done to any human being if conveyance is made or mortgage given without the exact notice required, unless it be wrong to the stockholders themselves. And as others are not concerned, why should the statute give them the right to raise questions of irregularity which the stockholders elect to waive? We are satisfied such was not its purpose."

If it be said that the framers of the organic law have seen fit to limit the power of corporations in this respect in plain words, and the courts have no right to construe away such limitations, the answer is afforded by the lucid remarks of Lord HALSBURY, in Cox v. Hakes, 15 Appeal cases, 1. c. 518, where he said:

"From these and similar examples a canon of construction has been arrived at which has often been quoted but which is so important with reference to the question now before your Lordships that I quote it once again:

" 'From which cases it appears that the sages of the law heretofore have construed statutes quite contrary to the letter in some appearance, and those statutes which comprehend all things in the letter, they have expounded to extend but to some things, and those which generally prohibit all people from doing such an act, they have interpreted to permit some people to do it, and those which include every person in the letter they have adjudged to reach to some persons only, which expositions have always been founded on the intent of the Legislature, which they have collected sometimes by considering the cause and necessity of making the act, sometimes by comparing one part of the act with another, and sometimes by foreign circumstances. So that they have ever been guided by the intent of the Legislature, which

they have always taken according to the necessity of the matter and according to that which is consonant to reason and good discretion.' "

The same rule is declared in Stradling v. Morgan, Plowd. p. 205a. This rule is the same whether applied to constitutions or to statutes.

It is pertinent to inquire what good or useful purpose would be subserved by requiring a public notice to be given for a stockholders' meeting, if all the stockholders actually knew of the meeting and were personally present at the meeting. A notice published in a paper is only constructive notice. It is never held to be as good as actual, personal notice. Its sole purpose is to call the stockholders together. If they all get together they are as much present at the meeting as if they had come upon notice. The notice is a means to an end. That end is to get the parties in interest together, or give them an opportunity to be present. But when they are all present the end is attained. A summons is a notice to bring a party into court. But if the summons is never issued or served, and yet the party voluntarily comes into court, and tries the case, neither he nor the adversary party can be heard to say that the judgment is void or even voidable. So it is with a stockholders' meeting, if all the stockholders are actually assembled in meeting. When assembled, the power to make a contract or execute a mortgage is just as full and complete as if notice had been given of intention to hold the meeting. Their acts bind only themselves.

If a public notice of a stockholders' meeting is intended for the benefit of the public and not of the stockholders, then some purpose, beneficial to the public, must be intended. What is it? If the public or any member of it saw such a notice in the papers and attended the meeting, he could not participate in it; he could not vote at it; he could not compel the meeting to increase its capital stock or prevent it from doing so. If the

purpose of the stockholders was the ulterior one of watering the stock or increasing the bonded indebtedness to an unlawful extent, his presence would not prevent that purpose being carried out, or if it was carried out he would have no standing in court to stop its consummation by legal action; if the purpose was to have him present so he could warn investors not to buy the watered stock or illegally issued bonds, it would be impossible for him to do so, for he could not reasonably be expected to know to whom the stock or bonds were offered, or when or where on the face of the earth the offer would be made. And this could not be the purpose as to an increase of stock, because section 964, Revised Statutes 1899, requires a certificate of the increase of stock to be filed with the Secretary of State, and section 1329, Revised Statutes 1899, requires a certificate of the Secretary of State that in making the increase the law had been complied with, thus furnishing a public record of the fact that such an increase has been made, which is open to every one who chooses to inquire before investing in such stock. If this is not sufficient to prevent stock being watered it is not clear how the publication of the notice sixty days before the meeting is to be held at which it is contemplated doing the act of watering the stock will have any such effect, or be any protection to the public.

Neither can it be construed that this provision is intended to give notice to the officers of the State whose duty it would be to call the act in question that such a meeting for such a purpose was to be held. For, as above pointed out, the increase of stock does not become effective until the proceedings of the stockholders and directors have been certified to the Secretary of State and he has filed them among his records and issued his certificate of compliance. So that the State's officers do not need any notice of the meeting, but get notice of the result of the meeting and must certify to the legality of the act before the result of the meeting becomes effective and before anyone

can be imposed upon by investing his money in such watered stock.

It follows that the reasons given for the result reached in the case of State ex rel. v. McGrath, 86 Mo. 241, fail to support that result. It is apparent also that that case is out of line with the adjudications upon the same question in all the other States. It is clear that the constitutional and statutory provisions construed are for the benefit of the stockholders and not for that of the public, that no useful purposes would be subserved be construing them to be for the benefit of the public, and that being for the benefit of the stockholders they can waive that benefit, and if they do so, and all meet and unanimously, or by a legal majority, vote to increase the stock or bonded indebtedness their act is binding on them, and neither they nor their creditors can be heard to deny the validity of the act.

For this reason the case of State ex rel. v. McGrath, supra, is overruled, and the deed of trust in this case held to be valid and a superior lien to the title of the defendants acquired under the attachment proceedings in the United States court.

## II.

It is argued, however, that the bonds specify on their face that they shall not be binding on the company unless they are certified to by the trustee, and that only sixteen of the seventy-six bonds held by the plaintiff, the German-American Bank, were so certified until several months after the defendants instituted their attachment suits.

No such issue was made by the pleadings and no such relief was asked, no such objection was raised and no such point relied on in the trial in the circuit court. The defendants pleaded that none of the bonds held by the German-American Bank were certified by the trustee until four months after

they began their attachment suits, and that therefore the bank was not a bona fide holder of the bonds, and hence their rights under the attachment were superior to the rights of the bank under the mortgage.

This is a very different position from that here taken. Here defendants concede that sixteen of the bonds were properly certified before the attachment suits were begun, and also concede that if the mortgage is valid the German-American Bank's claim as to such sixteen bonds is superior to defendant's rights under their attachments, but ask that their rights be given priority over the rights of that bank as to the sixty bonds that were not certified by the trustee. In other words, after charging that none of the bonds were superior in right to their rights, the defendants now for the first time ask this court to adjust the priorities of the parties as above stated. It is too late to raise such a question now. The case must be tried on the same issues and theories here that it was tried upon in the lower court.

### III.

It is insisted that the bonds held by the German-American Bank are held simply as collateral security for notes of the L. A. Kelsey Lumber Company, and hence that bank is not a bona fide holder of those bonds, and therefore its claim is subordinate to the rights of the defendants under their attachments.

The evidence does not sustain this contention. The facts are that before the first defective mortgage for $110,000 was issued, the Horton Land & Lumber Company owed the German-American Bank $25,726.23. Under the funding scheme, that bank advanced a sum equal to forty-eight per cent thereof additional, amounting to $12,348.86, to help to supply the cash to pay the small creditors, thus making the bank's claim against the Horton Land & Lumber Company, $38,075.09. For this

it received $38,000 in bonds of that company. It did not surrender the original notes of the company, but it did take the note of the L. A. Kelsey Lumber Company to an amount equal to the amount of its claim against the Horton company, indorsed by the Horton company. There was no novation, however. Neither was there any agreement that the Horton notes and bonds were to be held as collateral security for the note of the Kelsey company. The Kelsey company owed the bank nothing, and owed the Horton company nothing. The bank knew the Kelsey notes were made so as to apparently conform to the national banking laws. The bank could never have enforced them against the Kelsey company. It was simply an arrangement to make it appear that the bank held the notes of the two corporations instead of bonds secured by real estate security. While the attempt to thus evade the national banking laws is not to be commended, the form of the transaction did not change the fact or the debtor, and the defendants can not usurp the province of the Government and punish the bank for the evasion of the act of Congress. [National Bank v. Matthews, 98 U. S. 621.]

For these reasons the judgment of the circuit court is affirmed. All concur.